**KIRKPATRICK & LOCKHART**
  **NICHOLSON GRAHAM LLP**
Marilyn Sneirson (MS-6207)
Helen Elizabeth Tuttle (HT-3120)
One Newark Center, Tenth Floor
Newark, New Jersey 07102
973.848.4000

Attorneys for Defendant
Fuji Photo Film U.S.A., Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOBI WHITE,<br><br>                Plaintiff,<br><br>       -against-<br><br>FUJI PHOTO FILM USA, INC.,<br><br>                Defendant. | Case No. 05 CV 2937 (CM)<br><br>**RULE 56.1 STATEMENT** |

In accordance with Rule 56.1 of the Rules of this Court, Defendant Fuji Photo Film U.S.A., Inc. ("Fuji") submits the following statement of material facts not in dispute.

1.   Plaintiff was hired as an administrative secretary in the Quicksnap Department on October 9, 2001. [Id., Ex. B: Deposition of Tobi White, dated December 14, 2005 ("White Dep. Vol. I"), 43:13-16; 44:2-4; 54:18-23].

2.   By late 2001, Fuji retained an outside consultant to meet with all secretaries individually and evaluate their positions. [Id., Ex. B: White Dep. Vol. I, 48:21 to 49:4; 49:24 to 50:9; 51:14-19; 61:10 to 62:11].

3.   Plaintiff discussed her own job responsibilities during her meeting with the outside consultant. [Id., Ex. B: White Dep. Vol. I, 50:10-14; 51:14-16].

- 2 -

4. Several months later, in April 2002, as part of a company reorganization, Plaintiff was reassigned to work for Susan Schaffer in the Marketing Department for Digital Cameras. [Id., Ex. B: White Dep. Vol. I, 45:6-8; 59:5-14; 62:25 to 63:5].

5. Notwithstanding Plaintiff's official reassignment in April 2002, Plaintiff had assisted Ms. Schaffer since January 2002. [Id., Ex. B: White Dep. Vol. I, 66:10-14; Ex. C: Deposition of Susan Schaffer, dated January 12, 2006 ("Schaffer Dep."), 8:7-8; 8:21 to 9:6].

6. In approximately April 2002, Plaintiff's title changed from administrative secretary to office assistant. [Id., Ex. B: White Dep. Vol. I, 46:7-13].

7. Plaintiff's title changed as a result of information she provided to the outside consultant several months prior and not from the company's reorganization in April 2002. [Id., Ex. B: White Dep. Vol. I, 47:25 to 48:12].

8. Despite the title change, Plaintiff considered this the same level position. [Id., Ex. B: White Dep. Vol. I, 46:25 to 47:2; 48:19-21].

9. There was no change in salary and no change in grade. [Id., Ex. B: White Dep. Vol. I, 46:14-20; 51:25 to 52:2].

10. Plaintiff considered her reassignment to the Marketing Department to be a positive move for her. [Id., Ex. B: White Dep. Vol. I, 63:25 to 64:5].

**A.    Plaintiff Is Unable To Meet The Increased Demands Of Her Job**

11. The Marketing Department was, at times, fast paced and chaotic. [Id., Ex. B: White Dep. Vol. I, 126:24 to 127:5; Ex. C: Schaffer Dep., 18:13-17].

12. Indeed, Plaintiff admitted that it was busier than her prior department. [Id., Ex. B: White Dep. Vol. I, 63:21-24].

13. Plaintiff concedes that Ms. Schaffer was strict and demanding of everyone in the department. [Id., Ex. B: White Dep. Vol. I, 68:2-4].

14. Ms. Schaffer agreed that, due to the dynamic, fast-paced environment, she was demanding of all employees that reported to her. [Id., Ex. C: Schaffer Dep., 18:13-17; 50:14-19].

15. Plaintiff's job duties included, among other things, answering phones, taking messages, preparing memos, filing, assisting with product samples and monthly reports. [Id., Ex. C: Schaffer Dep., 9:13-19].

16. Plaintiff supported four product managers and an intern in addition to Ms. Schaffer. [Id., Ex. B: White Dep. Vol. I, 45:9-17; Ex: C, Schaffer Dep., 17:14-21].

17. Plaintiff was often frustrated by the very fast pace of the department. [Id., Ex. C: Schaffer Dep., 18:12-13].

18. Plaintiff would repeatedly advise Ms. Schaffer that it would be much "easier" for her (Plaintiff) to perform her job if the managers would better plan rush projects and requests. [Id., Ex. C: Schaffer Dep., 18:17-21].

19. However, this was not often possible because of business needs (i.e., market changes, the sales group, or the customers). [Id., Ex. C: Schaffer Dep., 18:22 to 19:2].

20. Ms. Schaffer, recognizing that Plaintiff may have been overwhelmed, advised Plaintiff that if she received urgent requests from several managers and she was not able to complete them, she should bring those situations to Ms. Schaffer. [Id., Ex. C: Schaffer Dep., 20:3-11].

21. Ms. Schaffer recalls few instances when Plaintiff brought those situations to her attention. [Id., Ex. C: Schaffer Dep., 20:12-13].

22. Ms. Schaffer first raised performance issues with Plaintiff in the Summer, 2002. [Id., Ex. B: White Dep. Vol. I, 69:15-18].

23. Ms. Schaffer raised the following issues with Plaintiff:

* Plaintiff used the intercom to advise a manager that his scheduled visitor was present for a meeting and a Fuji competitor was sitting near Plaintiff's desk [Id., Ex. B: White Dep. Vol. I, 69:23-25];

* Plaintiff needed to complete monthly reports on time [Id., Ex. B: White Dep. Vol. I, 71:20 to 72:8];

* Plaintiff ordered lunch for a meeting, but did not set it up [Id., Ex. B: White Dep. Vol. I, 69:23-25].

24. In addition, Plaintiff failed to fulfill simple requests such as timely filing, stamping incoming mail with a "received" date, and taking complete phone messages including phone numbers, names and other relevant information. [Id., Ex. C: Schaffer Dep., 16:17-22; 17:2-6; 19:5-11].

25. Plaintiff also appeared frustrated with manager requests, would not complete them and then failed to inform Ms. Schaffer (or the appropriate manager) that the assigned task was incomplete. [Id., Ex. C: Schaffer Dep., 19:17-24].

26. Even though Plaintiff received an overall satisfactory rating on her November 2002 performance review, Ms. Schaffer continually discussed with Plaintiff aspects of her performance that needed improvement. [Id., Ex. C: Schaffer Dep., 16:9-13; 16:17-22].

**B.    Plaintiff Is Placed On A PIP And Probation, Then Successfully Completes Program**

27. In 2003, Plaintiff continued to have meetings with Ms. Schaffer regarding performance. [Id., Ex. A: White Dep. Vol. I, 100:3-9].

28. Plaintiff was placed on a formal warning period from December 5, 2003 to January 5, 2004, later extended until January 30, 2004 because of the holidays. [Id., Ex. B: White Dep. Vol. I, 134:10 to 135:4; 139:2-5, 139:22 to 140:10; Ex. C: Schaffer Dep., 30:11 to 31:6].

29. Under this performance improvement plan ("PIP"), Ms. Schaffer outlined Plaintiff's responsibilities and worked with her to achieve that plan. [Id., Ex. C: Schaffer Dep., 42:9-14].

30. Plaintiff admits that the objectives in the PIP were tasks that fell within her normal duties. [Id., Ex. B: White Dep. Vol. I, 135:9-24].

31. Plaintiff agreed that most of the objectives listed in the PIP were reasonable except: (1) filing papers within 2-3 days of assignment at certain times of the year; and (2) keeping the sample room organized because people would constantly disorganize it. [Id., Ex. B, White Dep. Vol. I, 135:9 to 138:25].

32. Plaintiff was then placed on a second 30-day probationary period, effective February 16 to March 16, 2004. [Id., Ex. B: White Dep. Vol. I, 157:17-22].

33. Plaintiff was aware that if she did not successfully complete her performance objectives she would be terminated by Fuji. [Id., Ex. B: White Dep. Vol. I, 162:4-7].

34. Not until after she was placed on probation did Plaintiff file an internal complaint of racial discrimination/harassment. [Id., Ex. B: White Dep. Vol. I, 162:17-22].

35. This was Plaintiff's first written complaint within the Company. [Id., Ex. B: White Dep. Vol. I, 164:2-5].

36. She complained that being placed on probation was "an additional form of harassment." [Id., Ex. D: Letter from Plaintiff, dated February 17, 2004].

37.     Sharon Virgulak ("Virgulak"), Director of Employee Relations, Human Resources, responded to Plaintiff's complaint by letter dated February 23, 2004.  [Id., Ex. B: White Dep. Vol. I, 167:16-19].

38.     Ms. Virgulak explained that Plaintiff was not being harassed, but was placed on the PIP and probation because of ongoing performance issues.  [Id., Ex. E:  Memorandum from Ms. Virgulak, dated February 23, 2004].

39.     Plaintiff successfully completed her objectives during her second 30-day probationary period and was removed from probation.  [Id., Ex. F:  Deposition of Tobi White, dated December 30, 2005 ("White Dep. Vol. II"), 217:13-24, 252:8-21; Ex. C: Schaffer Dep., 44:13-20].

C.     **Plaintiff's Working Relationship With Ms. Schaffer**

40.     Plaintiff described her day-to-day interactions with Ms. Schaffer as follows: "There wasn't much interaction but she just always seemed she didn't like me.  Like I annoyed her or something."  [Id., Ex. B:  White Dep. Vol. I, 68:16-23].

41.     According to Plaintiff, Ms. Schaffer said nothing specific to Plaintiff, "[m]ore so it was her tone and she was very short with [Plaintiff]."  [Id., Ex. B:  White Dep. Vol. I, 68:24 to 69:3].

42.     Plaintiff felt that Ms. Schaffer "spoke down" to her.  [Id., Ex. B: White Dep. Vol. I, 74:5-11].

43.     When asked to cite specific examples to support Plaintiff's view that Ms. Schaffer did not "like" Plaintiff and that Plaintiff "annoyed" Ms. Schaffer, Plaintiff responded:  "[Ms.

Schaffer's] tone, the way she looked at me, the way she spoke down to me." [Id., Ex. B: White Dep. Vol. I, 74:5-11].

44. Plaintiff could only recall one negative exchange with Ms. Schaffer prior to April 2002. [Id., Ex. B: White Dep. Vol. I, 66:15-19].

45. Plaintiff explained that Ms. Schaffer was "not nice" to Plaintiff and was "[v]ery rude, obnoxious" and "[v]ery unprofessional" in "interrupt[ing]" Plaintiff. [Id., Ex. B: White Dep. Vol. I, 64:21 to 65:3].

46. Plaintiff testified as follows:

I can recall being on the phone with a VP that was traveling and needed some type of assistance. There was a problem with his flight. I don't recall. It was an urgent call, and she interrupted the phone call, and although I tried to tell her that I couldn't assist her at that particular moment, she still insisted.

When I tried to explain to her after the phone call why I couldn't assist her, she was still rude about it.

[Id., Ex. B: White Dep. Vol. I, 65:10-19].

47. After April 2002 when Plaintiff began reporting to Ms. Schaffer, she claimed that Ms. Schaffer "yelled" at her for various issues: not unpacking the belongings of a manager who was out on leave, missing cameras, relaying phone messages, and not correcting an error on a presentation before copying it for distribution. [Id., Ex. B: White Dep. Vol. I, 112:3-10; 113:20-23; 119:7-10, 13-25].

**D.  Plaintiff Frequently Meets With Sharon Virgulak, Director Of Employee Relations**

48. Within a few months of reporting to Ms. Schaffer, and contemporaneous with the performance issues in the Summer 2002, Plaintiff first spoke with Fuji's Director of Employee

Relations, Human Resources, Ms. Virgulak, about Ms. Schaffer. [<u>Id.</u>, Ex. B: White Dep. Vol. I, 75:5-16; 76:19-22].

49. Plaintiff cannot recall what she specifically told Ms. Virgulak during that first meeting, but recalls talking to Ms. Virgulak about "the overall treatment that [Plaintiff had] been receiving from [Ms. Schaffer]." [<u>Id.</u>, Ex. B: White Dep. Vol. I, 76:23 to 77:6].

50. Ms. Virgulak agrees that Plaintiff spoke to her (Virgulak) about Ms. Schaffer and the "personality conflicts" between them. [<u>Id.</u>, Ex. G: Deposition of Sharon Virgulak, dated January 12, 2006 ("Virgulak Dep."), 20:3-6].

51. Ms. Virgulak regularly followed-up with Plaintiff regarding the "personality conflict" involving Plaintiff and Ms. Schaffer. [<u>Id.</u>, Ex. G: Virgulak Dep., 28:11-18].

52. Plaintiff admitted that Ms. Virgulak always met with Plaintiff when Plaintiff asked to meet. [<u>Id.</u>, Ex. B: White Dep. Vol. I, 103:24 to 104:5].

53. Plaintiff contends that she told Ms. Virgulak that she (Plaintiff) "felt like [she] was being discriminated against." [<u>Id.</u>, Ex. B: White Dep. Vol. I, 77:20 to 78:4].

54. Plaintiff "felt excluded" in that she was not invited to attend manager department meetings, was not invited to lunch, and did not get "recognition." [<u>Id.</u>, Ex. B: White Dep. Vol. I, 78:8-16, 80:24 to 81:2].

55. Nevertheless, Plaintiff stated that, in her prior department, she did not attend department meetings and was not even aware if any meetings took place. [<u>Id.</u>, Ex. B: White Dep. Vol. I, 85:19-23].

56. In addition, Plaintiff only once went out to lunch with one manager in her prior department but says she did not feel left out. [<u>Id.</u>, Ex. B: White Dep. Vol. I, 80:4-16].

57. As to the so-called "recognition", Plaintiff testified as follows:

> A. I'm sure there are managers that have come to [Ms. Schaffer] and said, you know, that I've helped them out and they were appreciative, and she didn't, you know, get back to me.
>
> Q. Do you know which managers did that?
>
> A. I believe Robert Cartwright did, or even helping someone over the phone, a sales rep, with some information.
>
> \*\*\*
>
> Q. Do you remember which sales reps you helped out that would be in a situation where you didn't get any recognition for anything?
>
> A. I can't recall anything.
>
> Q. Do you know what Robert Cartwright told Ms. Schaffer about your work?
>
> A. I'm sure that I helped him out with something, and he would have gone back to her.
>
> Q. Do you know what you helped him out with?
>
> A. Maybe his assistant wasn't in a particular day and he was asking me to make photocopies or something. I really don't recall.

[Id., Ex. B: White Dep. Vol. I, 82:3-10, 82:14 to 83:2].

58. Ms. Virgulak recommended Plaintiff speak with Ms. Schaffer about these issues, but Plaintiff chose not to do so. [Id., Ex. B: White Dep. Vol. I, 87:10-14; 88:3-5].

59. Plaintiff explained that she did not speak with Ms. Schaffer because she did not feel "comfortable." [Id., Ex. B: White Dep. Vol. I, 88:3-6].

60. Plaintiff did not recall telling Ms. Virgulak that she did not raise the issues with Ms. Schaffer. [Id., Ex. B: White Dep. Vol. I, 88:7-9].

61. Plaintiff also felt discriminated against because she viewed her 2002 Performance Review as unfair. [Id., Ex. B: White Dep. Vol. I, 88:10-20].

62. According to Plaintiff, the review was "inaccurate" and "didn't take into consideration any of [her] job – how well [she] did [her] job in the previous department. There

was no input from managers. The fact that it was rushed." [Id., Ex. B: White Dep. Vol. I, 88:20 to 89:5].

    63.    Nevertheless, Plaintiff admits that she wrote and submitted the following on her Employee Self-Assessment Worksheet attached to her 2002 Performance Review:

    \*    "Due to drastic increases in responsibilities, normal day-to-day work is neglected because of time sensitive projects would require longer time to complete;"

    \*    "I feel I have taken as much initiative as time and department measures allow. Better solution on how to do a job better or more efficient."

    \*    "Improve communication and overall work relationship with supervisor."

[Id., Ex B: White Dep. Vol. I, 89:17-25, 94:21 to 95:4, 96:3-16, 97:25 to 98:8].

### E.    Fuji Broadcasts Effective Anti-Discrimination Policies

    64.    Fuji maintained and disseminated effective anti-discrimination policies to its employees, including Plaintiff. [Id., Ex. F: White Dep. Vol. II, 251:5-14].

    65.    These policies were contained in Fuji's employee handbook. [Id., Ex. F: White Dep. Vol. II, 375:22 to 376:3].

    66.    Plaintiff signed a form acknowledging receipt of Fuji's employee handbook and was aware of Fuji's reporting complaint procedure. [Id., Ex. F: White Dep. Vol. II, 376:4-6, 12-18; 379:9-12].

    67.    Despite these available resources, Plaintiff chose to tape-record conversations with her managers and human resources managers, without their knowledge, because she wanted to use these secret recordings as "evidence" in her lawsuit. [Id., Ex. F, White Dep. Vol. II, 382:9-12, 383:19-21; 383:25 to 384:7].

68. However, Plaintiff admitted that she could not recall any "evidence" of wrongdoing by Fuji on these tapes. [<u>Id.</u>, Ex. F, White Dep. Vol. II, 384:3-7].


Dated: Newark, New Jersey
      March 1, 2006

                                  **KIRKPATRICK & LOCKHART**
                                  **NICHOLSON GRAHAM LLP**

                                  By:<u>/s/ Marilyn Sneirson</u>
                                      Marilyn Sneirson (MS-6207)
                                      Helen Elizabeth Tuttle (HT-3120)
                                      Attorneys for Defendant
                                      Fuji Photo Film U.S.A., Inc.
                                      One Newark Center
                                      Newark, New Jersey 07102
                                      973.848.4000


TO:    Ian Belinfanti, Esq.
          Law Offices of Ian Belinfanti, Esq.
          481 8th Avenue, Suite 924
          New York, NY  10001